Good morning, please be seated. Good morning, I'm agoing to call in the permanent attorney, My name is James Abraham Capu President and CEO of Oklahoma Kennedand Child and Family Services, with a payment of 11 motion for summary judgment, and that the court must apply the standard for granting summary judgment to a defendant. The trial court must construe the facts of the case in light most favorable to the non-moving party. In this situation, the court did not do that. The court failed to adhere to the standard when it held that the plaintiffs had a duty to prove the decedent had possession of the gun at the time he was admitted into the hospital, and that the search that Provena Mercy failed to do would not have produced the gun that was the position that the plaintiff had taken in terms of their position for negligence on behalf of the decedent. And you submit that that was a question of fact for the trial of that, correct? Yes, Your Honor. It's the plaintiff's position that this case factually and legally aligns very closely with Petrucca v. Grant Hospital, and that if the case in Petrucca was allowed to get to the jury on the question of whether or not a belt that the decedent eventually hung himself with was in his possession when he hung himself or had the belt been removed from his possession, and somehow he sourced the belt from some other corner of the hospital. In this case, the defendants have argued very belatedly that Mr. Russell somehow sourced the gun after being admitted into the hospital, and that you have to bear in mind that the gun that Mr. Russell was found with when he was shot and killed was the gun registered to him. Let me ask you, how can Provena be held responsible for Mr. Russell's death when it was the Aurora Police Department's independent decision to use lethal force against him? I mean, wasn't this an intervening act that broke this causal chain? No, we do not believe that it was an intervening act. The courts have well established the fact that there could be two possible causes that contribute to an injury, and in this case, what the plaintiffs have posited is that but for Mr. Russell's possession of a gun, the Aurora Police Department would never have shot him. And his presence in that facility in the duty of the Provena Hospital to have removed the gun from a person who one, had a history of mental health issues that the hospital was well aware of, and two, was exhibiting mental health issues at the time of his admittance. He had been noted as being belligerent, incoherent. Before the shooting took place, Mr. Russell had to be physically restrained by two security officers. But now, he was on medication at that time. He had been given Ativan. Correct. This last reference I just made was after he had been admitted to the telemetry floor, so presumably he would have been treated. Into the behavioral section. Correct. So... No, no, telemetry. Okay. He had never been admitted into the behavioral section, Your Honor. He had in the past. Correct. Okay. He had a previous psychiatric history with Provena Mercy Hospital. So the night that they brought him into the emergency room, there was no check for the gun. Correct. That is our factual dispute at this point. That he, the plaintiff's position is that Mr. Russell, you know, just so we're clear, had possession of a gun that was registered to him. And that he came into the hospital with it. That he should have been processed before he was admitted to the telemetry floor at the ER. Regardless of whether they had a policy in the hospital of doing that, I believe the record reflects that there was a policy of doing a search before someone was admitted to the behavioral health unit, but not the hospital. So is it your contention that that should have been done, too? Or at least there was a factual question about whether there either was a policy or should have been a policy? Precisely, Your Honor. Our expert, Mr. Hawkins, who was prepared to testify, and who is an expert on management, hospital management, are positive for the purposes of this case that there should not be a binary policy in regard to searches on mental health patients. If there is a policy in regard, and there should be a policy in regard to searches on mental health patients, it should not be different by virtue of where he's being treated, where that particular patient is being treated. When did he become a mental health patient? Well, he had been a mental health patient. Right, but that doesn't presume that he's having mental health issues at the time of his admittance. He's brought in for physical issues. You're right, Your Honor. The issue that he was admitted for, he was diagnosed with altered mental status. So altered mental status would suggest that he was having some mental health symptoms. In fact, he, the record reflects that he was aggressive, incoherent, and being belligerent to the wait staff there, I should say wait staff, the medical staff that was attending to him. In addition, they were treating him, and you're right, for a dialectic toxicity. So I think that there has been some dispute, and once again factual, whether or not the dialectic toxicity gave rise to the altered mental health status, or whether he walked in with an altered mental health status as a result of some of his other underlying maladies. The issue is, though, that doesn't matter. Whether he was coming in there for a broken foot versus something else, if he was exhibiting mental health issues, he should have been admitted, and our expert was prepared to testify to him. Is duty at issue in this case, in summary judgment? I read the summary judgment motion, and it seemed to go only to proximate cause and intervening causation, and didn't raise duty. But then in the blue brief, in the response brief, duty is raised as a potential issue in summary judgment. Well, of course, we do not argue that duty is at issue. Petrucca establishes that duty attaches once a week to the hospital. The hospital has taken on the duty, and the patient is in the care and control of the hospital staff at that point. And so Petrucca and his position of the plaintiffs, the appellants, that the duty is not at issue because the duty manifested clearly at his admittance. And so it's not duty to protect Mr. Russell from his own criminal acts? Well, once again, I think Petrucca and there's actually another case, and I apologize, Your Honors, if I possibly did not raise it. But the plaintiff's mental health removes the consideration from a criminal aspect of the case, because the mental health of the patient is part of what's being addressed while he is in the care and control of the hospital. And so it's no longer a matter of his mental health, his behavior is a manifestation of his mental health, unless that can be proven otherwise, and that has not been raised. What is the purpose behind the search that was in place when somebody was admitted to the behavioral health? Precisely to avoid a scenario which presented itself in the case, it's the case here. The search, okay, well, wasn't it to ensure that they would basically not harm themselves or somebody else? And that's one of the reasons that you're admitted, but also I believe somewhere in the search they discussed that. That's correct, Your Honor. And my only hesitation is that the reason why it has been possible, the reason why the search didn't take place in the telemetry or the medical part is because they did not have the policy to apply at the medical staff. And we believe, Mr. Hawkins, our expert, has posited that there should never have been a binary standard for the use of the employment of a search policy for patients. Because there's not two patients, there's one patient that presents with a range of maladies that have to be addressed. You don't just address one high blood pressure and the person has cancer. You have to address all of the issues that are presented. In this case, Mr. Russell presented with mental health issues and mental health issues. I have a family member that has recently died of phlebitis, dialectic toxicity. Back in July of 2014, did Judge Keith Brown deny the motion for summary judgment? Yes, he did. And what was his basis for the denial of that motion? Precisely the discussion that, you know, that we're having, that a jury could absolutely find that proven and mercy had failed to observe their clearly and historically mentally disabled individual who was exhibiting belligerent and perhaps aggressive behavior tendencies towards the staff at that time. Did the defendant at that time raise the issue that Mr. Coleman, I'm sorry, Mr. Russell, possibly had the gun delivered to him in the hospital? Your Honor, the first time that issue has been raised or that theory has been raised was in January of 2017. So it wasn't before Judge Brown? No, no, it was not. And you argued in the summary judgment that the gun was registered to Mr. Russell? Yes. In your brief, you cite to the transcript, which is your argument. You don't cite anything in the record as far as where that shows up. Where does it show up in the record? It's a voluminous record. Where does it show up that the gun is registered? It was definitely in the police report, but that might not have been obviously submitted to the court. And it was also in one of the deposition testimonies, I believe, of Dorothy Coleman, the administrator, who was also the sister to Mr. Russell. Ms. Johnson, in the future, you might want to cite to that portion in the record so that we don't have to sift through the record to find out what you're trying to point out to us. You're right, Your Honor. Because I did look through the police reports, and the only police report I could find was one that said that they tried to locate where the gun was registered, but they couldn't locate it. And so I never saw one. It was at C-1576. It's an Aurora police report where a detective asked an officer to look into this, and they said that the gun was older than ATF records, so they couldn't track it down. So, again, maybe it's in Ms. Coleman's deposition. I don't know. And the other thing is, in the brief, you cite your appendix a lot. Having a good appendix is certainly helpful to us, but you have to cite to the record on appeal, not the appendix. All right. And I think, you know, I can see those failures, Your Honors, and I certainly don't want to cloud your ability to review this case because it's very important to me. Sure it is, and it's all for the promise. The record is 2,000 pages long. Yeah. It was a problem for me, too. And just, Your Honor, just to address the concern that you raised about whether or not that case, the gun was actually registered to Mr. Russell. I don't think that that issue really drives the position of the paper, of the appellate, because that, too, is a factual dispute. There's no doubt, what's not a dispute is that upon this man's death, he was in possession of a gun. How he sourced it is going to be a question that would be presented to the jury as a question of negligence one way or the other. It is our strong position, we think the facts support, we have the testimony and other things to support the fact that that was Mr. Russell's gun and that he brought it into the hospital with him. But even if he found that gun, he was in the care of the hospital at that time. Was there any evidence at all to support the theory of the defense that the gun came in later?  I think so. Your Honor, I believe the last question that was posited to me is why isn't this a question of intervening? Yes. And I wanted to, I thought I addressed it, but just so we're clear, you know, in terms of the appellate's position, ultimately, whether or not two circumstances combine to create a particular result, does not vitiate the responsibility of either particular party in their contribution to the outcome, particularly in terms of its foreseeability, which is what the defense has tried to raise as a burden for the plaintiff to not be able to support. It's absolutely foreseeable that should a person who is mentally ill be allowed into a hospital with a gun, it's absolutely foreseeable that he may brandish it and be shot and killed. Thank you. Thank you very much. May I please have the court counsel? My name is Garrett Bain. I'm here on behalf of Havena Hospitals. This court should affirm the summary judgment for two main reasons. One, the plaintiff has lax, adequate evidence and facts to support the presence of a duty or approximate cause to support the negligence claim. Let me ask you about the duty, because I mean, I read through several times through your motion for summary judgment, and it only goes to approximate cause. Now you're arguing duty on appeal. And the trial judge clearly ruled on approximate cause, correct? Certainly. Okay. And you can certainly argue another theory on appeal if it's in your summary judgment motion, but I'm just wondering how you can argue something that's not in your summary judgment motion now. I believe, Your Honor, and I did consider that in preparing for today. And looking at the law, the law suggests to me that on review, this court can affirm on any basis supported by the record. And it is Provena's position that the record supports the lack of a duty here because of a lack of foreseeable cause. You're right, we can, however, you can't raise a new issue on appeal. We can affirm on any basis, but how is it that you can argue on appeal that which you did not argue at the court below? Your Honor, I don't think that I'm, if there is a basis for the argument in the record, I don't think I'm precluded from bringing that argument on appeal, even if it wasn't raised to the district court below. So if I'm wrong on that, I'm sure you will tell me. But I believe as long as there is support for the position in the record that this court can affirm on any basis, it's not too bad. Let's talk about duty for a minute. I mean, you're arguing foreseeability, which is one of the factors, but duty ultimately is a relationship. Correct. And it's a relationship. I mean, if you look back at the Supreme Court cases of Simpkins and Spradley, it's a relationship between the two individuals, between the two people involved. So here we have a hospital and a patient. Are you telling me that a hospital does not have a duty to keep a patient safe? No, I'm not saying that. And I think what the issue really goes to and is related to, and maybe better stated under the intervening clause analysis in this case, because what we're really talking about is even if there was a duty to conduct a search in the ER, which I suggest that there was not, but maybe there is a question of fact as to whether there was, we're talking about not two proximate causes, but two very separate acts of duty. One possibly by Provena and the other by the Aurora Police Department. These are not concurrent acts. They are not two proximate causes acting in conjunction. They're completely separate and unrelated. The Aurora Hospital Police Department came in an overwhelming force. Would you agree that the proximate cause is either a but-for test or a substantial factor test? That's what the Supreme Court looks at, those two tests, correct? Correct. So if Mr. Russell did not have a gun, if he did not have a gun with him, are you telling me that, well, let me put it a different way. The fact that he had a gun, I mean, but for him having a gun, the Aurora Police wouldn't have been called in in this massive force. True. And wouldn't have responded with deadly force. I mean, if he was holding someone hostage with a plastic fork or something that he got from the commissary there, you know, I mean, the gun puts us in a totally different position. We're talking about but-for, a substantial factor in his death, correct? Well, I disagree. It was certainly the but-for, the presence of the gun, the Aurora Police Department maybe didn't come with 15 people. But the acts that occurred after the Aurora Police Department coming were acts that were not related to any act of provenia. These are acts that the Aurora Police Department took on its own accord. They decided that they would bring in two negotiators, they would have snipers, they would have, you know, 10 police officers on the floor. They spent four and a half hours there during the standoff. And what did they do? They weren't able to negotiate him out. They didn't act with restraint, I would suggest, or patience. They made various attempts to try and make Mr. Russell remove his gun or lay down his gun or come out, but he didn't. And instead, they didn't call his family. They had his family come in and try and, you know, talk him down and bring him out. But instead, after four and a half hours, the door opens momentarily and closes. 30 seconds later, the door opens a little bit more, and maybe he sticks his head out. And an officer yells, gun. Well, there was no, you know, Mr. Russell, drop your gun, we see you, please come out, we don't wish to harm you. It was gun, and then there was a shot by a nonlethal weapon, and then six more shots by a lethal weapon, and a use of lethal force. And I would submit that these are not, these are independent acts. But how did we get there? How did they get there? If there weren't, if there was a search and the gun was located, they would have never been there, correct? Correct. And that brings up. So how did anything change from July 1st, 2014, when Judge Keith Brown denied the motion for summary judgment, versus October 23rd, 2014, when Judge Mueller granted the motion for summary judgment? What facts changed in between those events? Thank you, Your Honor. And what changed was what the courts were looking at. And the second time around in summary judgment, the court was looking at, okay, let's say that a search should have been performed in the ER, or even on the telemetry unit floor. How would that search have been performed? What would have happened if that search had been performed? We don't know. There are no facts in this record saying how the search would have been performed in 2006. There are no facts in the record suggesting that if the search had been performed, it would have been done peaceably and safely. Were those questions for the trier of fact? No. I suggest, Your Honor, that the plaintiff has to come forward with some support to allow the jury to then decide, yeah, if a search had been performed, it would have been done peaceably, the gun would have been removed, and Mr. Russell would have not been injured. These are one, two, three leaps, and they all require speculation. Here's a leap. He may have received the gun when his sister came to visit him or somebody may have brought it in. Isn't that a leap? Based on the trial of the hospital? Made by the trial court? Made by the argument of the hospital and then accepted by the trial court? I don't think the trial court considered it, but I don't think that that was why the trial court granted the summary judgment. We rely on it. I think the trial court focused upon what would have occurred if a search had happened. Would that have solved the issue? Would that have avoided the injury? And I think that's really what the question, in order to reach the jury, there has to be facts saying that if the search had been performed, it would have been done safely and the injury would have been avoided. Well, let me read what the trial court judge said. Tie in, in addition to that, the fact that we don't know, we don't have any evidence that the gun was in his possession at the time he came into the hospital, as opposed to being provided to him later. And I know that's difficult. It's a difficult ruling, but I can't allow a jury to simply use speculation, conjecture, or guess to make those conclusions that are really necessary. Aren't those reasonable inferences that can be made and issues that are for trial effect? I mean, the court didn't rely on it, but that's a strong, strong, strong evidence that he did rely. I'm looking at now the tie-in language, Your Honor. I do have that. And, again, I wasn't there. We weren't there. We're just looking at the transcript. My view of the transcript is, you know, there was a string of questions that focused upon, you know, whether the plaintiff had any evidence to say how a search would have been conducted. And rather than whether or not he got the gun, if he had the gun in the ER or he had the gun in the telemetry unit after his sister came, we don't know. But even assuming he had the gun in the ER, again, is there any facts to support what would have happened if a search had been conducted? Now, the plaintiff wants to look at the – and Mr. Hawkins seems to look at the policy, the behavioral health services contraband search and removal that applied to the BHS unit. And I would just point out, Your Honors, that this policy that's in the record is a policy that was issued after the occurrence. So I don't think that the plaintiff should be relying upon that post-occurrence policy, or the expert should be relying on that post-occurrence policy. There may be a version that was earlier, but we don't have that in the record. This is a post-occurrence policy in the record. But the expert is also relying on the fact that a search should have been conducted upon him presenting as having mental health issues, correct? He does say that. Basically, if there's a policy, great. If there's no policy, there should be a policy. He's opining in that regard, correct? Right. And he has no idea how the search would have been performed. When you say how the search would have been performed, I don't – I'm at a loss for that. The guy comes in, he has clothes on, he has stuff with him, and then he gets a hospital gown on. The search is the search's belongings. I mean, if there's a gun there, what do you mean, how the search would have been performed? Well, for instance, consider the testimony of Nurse Degati. She says generally we don't do searches. What she describes is the patient would be given a gown, would be asked to take his clothes off, and the clothes would then be given to the nurse. But there was no hands-on, strip search, warning, or anything like that. The patient simply provided clothing to the nurse. The nurse either looked at it there or at the nursing station. So there was no monitoring of, you know, let's make sure we know exactly where this patient was. You sound like you're arguing this to a jury, and that's what facts are for. You know, your cohort, I don't know, someone from your firm argued this in the trial court, and did in fact argue that there was no evidence that he brought the gun in with him, correct? Right. Well, I mean, I draw your attention to C-92, which is your affirmative defense, all right, filed by your law firm. Number three, paragraph number three of your affirmative defense, Johnny Russell III came to Purvina Mercy Medical Center of his own accord carrying an inherently dangerous weapon, namely a gun. In Coleman I, which is, you know, the case before this when it was on appeal, we held that certain factual allegations were admitted by the plaintiff because they were not denied factual allegations in the affirmative defense. These include the allegation that Russell came to the hospital while carrying a gun on his person. So now we have an admission by your firm on behalf of the hospital that he came there with a gun on his person, and we have a finding by this court, which is now the law of the case, that that fact has now been admitted by the plaintiff. I see that, Your Honor. I'm not making that argument. Okay, so you're not arguing, you're basically saying even if he came in with a gun, there still aren't enough facts. Correct. I agree with Justice Shostak that it seemed like the trial court, you know, may have supplied him the gun later. And, again, this court reviews it to know how it was thought, and I'm certainly not focusing upon whether or not he had the gun in the ER or the telemetry unit, but simply, you know, if even F, the search had been deducted, is there any evidence to support that this would have turned out differently, that the gun would have been found peaceably and the injury would not have happened, and that requires speculation. There's not any evidence in the record. Well, isn't that what the expert provided? The expert provided testimony with respect to a search, and maybe they didn't testify to your likeness to the specifics, but isn't that enough to get this case to the jury? Aren't these issues for the trier effect? I don't believe so, Your Honor. And looking at what Mr. Hawkins testified to and his report that appears at C-2009 in the record, I just don't believe that he provides, he concedes that he doesn't know where the gun was. He doesn't know how the search was performed. He just thinks that the policy should have been in effect in the ER to conduct a search, and he suggests that there were facts supporting the search should have been done. I think that is contested, but we'll put that to the side. So I don't think that he provides the necessary opinions or evidence to pass muster and avoid some re-judgment here. One issue that was not responded to that I'd like to address quickly before my time is up, was not responded to by the plaintiff on appeal, and that is where a plaintiff's damages are the result of criminal conduct. The estate cannot recover. And I think that's an important issue here. You're relying on the Reed case. The Reed case, and it also goes back to the Newton v. Illinois oil case. And there's also another case out of this district that I did not cite in my appellate brief, but it's a 1954 case by the name of Castronovo v. Murawski. And I can provide that cite to you. It's 302nd-168. Again, another issue that wasn't raised in the summary judgment motion. That's correct. It was not raised in the summary judgment motion. But I think as a matter of law, here we're faced with a situation where, even if this was remanded, that argument wouldn't be made, and I think it would be successful. So if the hospital had a policy that they searched people in Mr. Russell's position, Mr. Russell was not searched, so they violated that policy. They violated the duty of care. He came in there with a gun, and he shot another patient. You're saying then that the hospital would not be liable for breaching that duty of care because Mr. Russell's criminal acts in shooting the other patient would take it out of there? Liable to the other patient or to Mr. Russell's estate? I think that's a different question. The other patient. I think that's a different question. I mean, what the law states is that a plaintiff or his estate cannot recover for damages resulting from his criminal acts, from the decedent's criminal acts. You're talking about recovery. We're talking a mental health facility here. So if somebody who is mentally unstable commits a criminal act, how do we find out whether they're crippled or not if they have no mental aid? There is no evidence here that he was mentally unstable at the time of this occurrence or when he was in the ER. That is completely trumped up by the plaintiff. What is in the record is that there was altered mental status, unaltered mental state due to Dilantin toxicity, not just psychosis. There's nothing in the record showing that he had any element of psychosis while he was in the ER or on the telemetry unit. And in order to get there, the plaintiff would have to have expert testimony showing that there was a mental incapacity of Mr. Russell so that he wasn't able to comprehend the difference between right and wrong. He was able to comprehend that difference. He then used a gun and engaged in an aggravated assault, which is on all of the police reports. That's the problem. A case gets to be at, what, 10 years old or whatever, and then the theories just keep coming and coming and coming, and they aren't even presented to the trial court in the first instance. I mean, I don't know. Thank you, Your Honor. Thank you. Ms. Dotson. Your Honor, just briefly on the last point, in regard to the altered mental state of Mr. Russell, it was in the record reflects that the doctor, he was, Mr. Russell, after he was being admitted to the telemetry floor, was being assessed to be removed from telemetry floor to the mental health setting because he was exhibiting mental health symptoms. So had he been assessed? His doctors, he had two doctors that were reviewing him for mental health assessment to be transferred from telemetry floor to the mental health section of Provena that day. He had been already assessed for that and really was just waiting for the transfer. So he was already exhibiting mental health concerns. And I just, unless you have other questions for me, I just want to clarify that. The psychiatrist had prescribed medication for him. In fact, that's correct. Yes, correct. Thank you very much, counsel. Thank you. The court will take the matter under advisement and render a decision in due course. We stand.